et al. Arguments not to exceed 15 minutes per side. Mr. Curlew for the appellants. Good morning to the panel. My name is Douglas Curlew. I'm appearing on behalf of the appellants, Lewis, Kapp, and Richnack. I would like to reserve five minutes of my time for rebuttal. Fine. I believe the case has been rather thoroughly brief, and I don't want to retread ground that we've already gone over in the written submissions, absent questions from the panel. I just want to say I think the most telling segment of the district court opinion is where the judge says that the comment by Robert Surgisson that was overheard by the dispatchers, that I need a ride, I'm going to kill that bitch, was something interesting. I can imagine the howls of protest from all corners of the Bay City community if they thought their police department simply regarded such a declaration heard by a dispatcher as something interesting. It's something alarming. It's something that the officers had no choice but to respond to in the sense that there was clearly a declaration that could have meant a murderous felony was going to take place, and they had to respond accordingly. Now, I think the judge in the district court gave far too much focus to the fact that ultimately Kishma Brown was, of course, innocent of that, had nothing to do with the statements that had been made that had been heard by the dispatcher. Take me back through and explain to me the exact basis for the reasonable suspicion in this case to stop the vehicle. This wasn't one of those situations where you're getting an unknown tip from somebody. This is a situation where we've got our dispatcher on the phone with an open phone line where the original caller had left the phone off the hook. And the dispatcher is listening, of course, to the person in the house, which we now know, of course, was a drunken Robert Surgisson who was just rambling. But the first thing he talks about that is overheard through the open phone line that's reported by the dispatcher to the officers is he's barricading the house. I'm going to hide in the basement. The police are coming. Don't let those fuckers in the door. Then after that seems to have passed, he's talking with a male. I need a ride. I need a ride. And he says, why do I need a ride? I'm going to go kill that bitch. Now, nobody knows what really the context is. This is all they're getting on the phone. But we've got a male voice who's first barricading his house against the entry and arrival of police for who knows what reason, who's now saying, I need a ride because I'm going to go and kill a bitch. And at that same time as when Officer Ross gets there with his patrol car responding to the original call and sees... Because I thought by the time she was pulled over, the 911 operator was at that point hearing him still in the home speaking. What the officers have gotten is the timeline is that after the kids called to report to their mom, Leslie Surgisson, you know Uncle Robert's acting like an idiot, you need to come home. Leslie is brought home by Kishna Brown. They come into the driveway. Kishna says, I'm only there for a moment. I'm helping Leslie in. She's got a baby. I take the baby in, set the baby on the floor. I'm there perhaps a minute before I get out to the car and leave. Leslie has just gotten into the house at the point when Kishna is leaving them in the car. That's when Officer Ross has arrived and has seen this car leave. And what he reports is, now we know there was someone in the house who said, I've got to get a ride. I've got to kill that bitch. He arrives to see the car leaving and the officers say, here's the car. There's no evidence that he saw anything before seeing the car leaving. He didn't see the car arrive. No, that's correct. He did not see it arrive. He didn't see Kishna get back in. So he gets there just as the car is pulling out. She heads off and the officers are already converging on the site. So they start pursuing that car. They say, I see the car leaving. Here's the street it's on. And they start pursuing the car. But Judge Stranch was asking about, didn't the dispatcher know at that point in time that Sergison was still in the house, that the 911 caller was still in the house? Well, there were male and female voice in the house at that point. It's not clear what they're talking about. It's not clear what the whole time frame is, but what the officers had already begun their pursuit of the car immediately before Leslie got in and was able to have conversation that the dispatcher could overhear. The pursuit down the road was already happening. It wasn't a conversation that the dispatcher overheard. It was the continuing statements of a drunken voice of a male. It was Mr. Sergison never leaving the home. I'm kind of lost with how you've got, as I understand it at law, you've relied on or the cases rely on this collective knowledge idea. So you've got the collective knowledge of the team that you're representing, and that collective knowledge includes the fact that the 911 operator still hears the same drunken male speaking from his home location while your officers are pulling over and pulling out someone different. How can that not vitiate reasonable suspicion? The officers who were making the stop have already committed themselves to making the stop or in the process of making it before it's clear that there's still that other voice. If you look at the time frame, that background voice where you hear they were pulling it over in the BP on the 911 CD, I think it's 1918 on that time, they're already in the process of doing that job. They're not getting more information from the dispatcher at that point. They're stopping the car. They're converging on it and stopping it. They're not getting that subsequent conversation that's going on apparently between Leslie and Robert in the house. Because? They're already doing the convergence on the car to get it in the BP. Well, they followed the car for a while and supposedly intended to pull her over, and then she ended up at a gas station. Right. It was about a block and a half. During this time, the 911 operator is not conveying any more information to them and she's still hearing the man in the house? I didn't see any indication that there was subsequent, you know, a little hard to make out, but I didn't hear that there was a subsequent transmission. The officers, what they had when they testified, was we had been told about the barricading the house against the police, the fuckers who were going to come to the house, and then we're going to go out and kill the bitch, and this is why we're chasing the car, and this is the car we pulled. Why doesn't the collective knowledge doctrine undercut your case if the 911 operator knows he's still in the home? I don't know that the 911 operator knows specifically, but that's the same. Remember, there were two male voices. There was a young man's male voice and this same guy continuing to speak. Correct. Okay. We can hear that now. This gets into the whole surge of the moment. This is what's talked about in the Supreme Court in Ryburn v. Huff and this court in Bradstreet. You know, now that we can all stand back and listen carefully to the voices, I listened to the CD over and over, as I'm sure the court did because I know it got the CD, and obviously you've heard the tracks. You know, we can all sit here and look at it after the fact, but in the time when all this is happening in a big, fat hurry, officers are trying to respond. They're racing down the street to get to a house, and they hear there's a car. No, we've got to divert and chase the car. Let's pull this car over at the BP, and let's get to the bottom of what's going on inside that house. Even assuming that there was reasonable suspicion to stop the car, don't you run into problems vis-à-vis what happened in the course of the stop in terms of throwing Ms. Brown out onto the sidewalk, handcuffing her in a very unpleasant way with the knee in the back and so forth? And the theory was that Officer Ross was chasing the male who was saying, I'm going to kill that bitch, and instead they find that they have stopped a single woman in a car. Which they quickly found out after they had gotten out of the car. But they kept her in the handcuffs for 10 minutes, and when they were throwing her to the ground and so forth, there were a number of police officers and just this one person in the car, and apparently she was screaming, according to her, and you have to take the facts so that you could tell from her voice that she was a woman, wasn't the male who was doing the threat. So if you could respond to that problem that I have. Remember, by Ms. Brown's own testimony, it's raining, it's dark, I'm 5'11", 170 pounds, she's a 1.200 other. She's certainly equivalent to male size. She's got a hoodie, a black hat. She says, I can't even see the faces. The officers are converging on the car to get what they suspect is a man who may be armed and off to do no good. Pulled out of the car, onto the ground, and now, again, in hindsight, I would be incensed by that, so would you, but in the context of the time. Let me ask you, didn't Officer Lewis testify that when he heard her voice, he knew she was a woman? When they talked to her afterward, not initially. This was after they got her in the handcuffs, they lifted her to the ground, and then we all realized she's female. At that point, all the rough stuff ended immediately. They made the phone call and they realized it. She's all in the car and pointing guns at her, and she's screaming. He didn't recognize her voice as a woman, but when she stood up and spoke again, he recognized her voice. Speaking rather than screaming is different. Yeah, I would think a woman's scream would be clearly a woman's scream, but you tell them, I'm confused by that distinction. Right, but they said we did not perceive her to be female at that point, but it was hands off as soon as they got her up and realized that. They kept her in the handcuffs only 10 minutes, which is significantly less time than in the Dorsey case and the Kalanowicz case and the other ones that we've cited in the brief that the court already knows about. And, you know, again, the situation, she said herself, it lasted seconds before I was handcuffed and up. It's at that point that all that kind of rough handling ends, and they just make the phone call, and as soon as the phone call dispels their suspicions, they let her go immediately. They said, they just let me go. Again, it's a question of the context where we can't second guess what the officers do in this kind of exigent situation where they think they've got a real problem on their hands. I see my time is finished. If there's no more questions, I'll yield the floor. Thank you. Good morning. Good morning. May it please the court, Nick Bostick on behalf of the plaintiff, Kishna Brown. Judge Stranch, I'd like to address something that may help your questions. My recollection of you have to take the 911 dispatch log, the incident log, which is document 18-9 in the lower court record. It was attached to the defense motion. And lay it down next to a timeline of the transcript, or if you're listening to the audio, you can do it that way. And those are roughly the same. We don't know that those clocks were synchronized, but once you figure out the time frame, you know the differentials. The tape, the disk is 18-2 in the district court record. I think they sent it separately to this court. And I thought that there was a transcript that the defense had prepared, and maybe I'm wrong, but you can still create a timeline. My position is that the answer to your question is yes. The dispatcher heard Mr. Surgisson still talking on the phone prior to the stop. Does it make a difference if the dispatcher then did not convey that information? I think it does, and it goes to Smoke v. Hall. I think it's the collective knowledge issue. But then again, I don't think the dispatcher gave the officers enough information over the radio to create their level of suspicion in the first place. But nonetheless, yes, I think the dispatcher has an obligation to pass along critical information, and obviously what was going on in the house is what the defense is saying was so critical. So yes, she has that obligation to pass it along as the circumstances change. I guess the problem that I have is isn't there enough reasonable suspicion under Terry to stop the car? Your Honor, I would very reluctantly agree that if she would have been moving, in other words, we conceded that it wasn't a Fourth Amendment seizure for the stop because her testimony is she pulled up and stopped of her own volition. But if she were moving, I would reluctantly concede that to pull that car over under Terry v. Ohio to make some initial inquiries of the occupant would have to be upheld. Okay, but you're correcting me factually that she actually stopped the car in the BP gas station before the police forced her to stop because she thought she was being followed or whatever, that they were going on a search for somebody else, actually? She thought there was a high-speed chase. She comes off of a side street and turns north. The police messed up a communication, and they went south on that main highway. And in her rearview mirror, she sees the lights. Then she sees the U-turn of all of the marked cars. Now, Officer Ross was in an unmarked car. So she sees the U-turn of three marked police cars a few blocks behind her, and she wants nothing to do with it, so she pulls over and gets up on that apron. In the BP gas station? Yes. Okay, so so far she has stopped, and we're obviously taking all the facts in the light most favorable to your client. She has stopped. Would you agree that the police would be entitled to ask her questions because they were going to stop her and try to figure out what is happening in this house where this 911 call came that included this I'm going to kill the bitch language? I agree that them walking up to her and asking her questions is not a constitutional violation. So really the issue is the amount of force that's used to force her out of the car, onto the ground, handcuff her, and then keep her handcuffed for the 10 minutes. Yes, and I'd like to explain why in my brief I objected to jurisdiction on counts 2, 3, and 4 and not count 1, and that is because there is no factual dispute between the parties up to the point where she was grabbed. And what I'm saying is that the manner of conducting that Terry confrontation with the vulgarity, the guns aimed at her head, the screaming, and the surrounding of the car, before they even touched her, I'm saying that that was unreasonable based upon the tenuous and vague nature of the reasonable suspicion they had. And that gets us into the smoke analysis of you have to look at all of the circumstances. And then the Russo case I cited is the segmented analysis, and the defense indicates, well, it's so fast, how can you do a segmented analysis when something only lasts a few seconds? That's their training. That is what they're supposed to do. They have to react to the circumstances they're faced with. In this case, we had some fairly experienced police officers with some significant training reaching all kinds of conclusions on their own above and beyond what the dispatcher is giving them. Now, police officers can be cynical, they can be overly cautious, I'll give them that much, but they still have to have an objective baseline. And then to reach into these speculative conclusions that there's a kidnapping, there's a hostage situation inside the house, I just don't think the dispatch information supports that. Given the statement that the dispatcher relayed of Spurgeon that I'm going to kill that bitch, and given that there was reasonable suspicion to stop the car, why wasn't there enough for the officers to order Ms. Brown out of the car and pat her down for weapons? Now, because at that point the officers say they thought it could have been a male. Was there some other fact issue that would make this not appropriate for qualified immunity? I may be wrong, Your Honor, but I don't recall any mention of weapons being relayed to the officers by the dispatcher. But in a Terry stop, normally the police are allowed, if they have a basis for concern about their safety, they're allowed to do this limited pat-down. Well, and a reasonable articulable suspicion for the stop, and then the same standard for the pat-down, but separate facts. I mean, they can be the same, but there has to be a second justification for the pat-down. We have three armed officers walking up to the car. I asked them all, was there enough lighting? Could you see? Were you comfortable with what you could see? They all said yes. No tinted windows. I'm assuming we had street lights. Nobody remembered exactly where they were, but they said there was enough light. The one officer, I think it's Reschnack, walks up to passenger side. According to my client, he opens the back door, sticks the gun in the car at her head. The dome light should have come on. Then he closes the door and then walks around to the left front corner. I asked him, were you able to see in? Did you see bags? Did you see weapons? Did you see anything? Nothing. And he could see her hands. She kept her hands where they could see them. So the problem with the pat-down, the ability to pat down, is that from the Terry stop, assuming it's justified, nothing is going on to increase the need for the pat-down. They simply, it doesn't ever get there, which is the same thing in response to assault and battery, my argument about lack of probable cause for the good faith immunity under state law. Once they have contact with her, nothing happens to increase the reasonable and articulable suspicion that you may find they had in the first place. I asked them all. I was very, I knew that was very important, and none of them ever said a word that anything increased their concern once they got out of their cars and marched up to her. Well, they seem to make a lot about her physical size. She used to work for, well, she still works for the company, but she was a furniture mover. She worked for two men in a truck. So their point is it was objectively reasonable for them to think that this person driving this car was a male. No. I think it was objectively reasonable to say that they didn't,  I think the better position on that is that it was ambiguous and it was a question mark. And I think that puts a burden on them once you say I'm walking into an unknown. You can't automatically escalate to the top level of force based on what you don't know. And so I think it would have been ambiguous. Her stature, you know, she was wearing a flannel and perhaps a jacket on top of that. So I don't fault them for not immediately recognizing her as a female. But I can't agree that they had a basis to decide she was a male. I think it was just an unknown factor for them at that point. How do you distinguish Dorsey? I'm sorry, Your Honor, Dorsey being? Well, that's the case that the defense primarily relies on. There was a seizure of men in that case. Is that the bicycle riders? Now you and I are both going to have to remember, aren't we? Sorry, I don't normally reflect issues to a particular case. I'm sorry, I can't place the facts to the name. Then give us your best case. Smoke versus Hall. And I noticed in their reply brief they mentioned it's Kibre versus Duva, D-U-V-A, 530 F. 3rd, 475. I thought that was an interesting case because it said the fact that a situation unfolds quickly does not excuse the use of excessive force. So, again, I think Smoke is our best case. Now, there was a case in 2010 authored by Judge Moore, United States versus Maurice Johnson, 620 F. 3rd, 685. It doesn't exactly get into the excessive force issues, but what it does have is a really good collection of reasonable suspicion cases where reasonable suspicion was found and reasonable suspicion was not found. So I'm conceding that their initial contact with her was not a violation, so for that reason United States versus Maurice Johnson doesn't help us on that issue. But I think when you look at Johnson and you conclude, well, if in all of these cases there was no reasonable suspicion, then there's nothing to escalate those facts in this case to justify the further intrusion and the manner of intrusion. To sum up, Your Honor, I would point out that Defendant Camp, in his deposition, admitted that they were going to stop the vehicle to gather intelligence to allow us to know what's going on. And that deposition is attached to the defense motion. It's document 18-5 in the lower court record. The page identification number is 156. That's the real reason they stopped the car. They wanted to gather intelligence about what was going on inside the house. And that's why I say, you know, maybe that's valid under Terry, maybe. And we all know it happens in search warrant cases. It happens a lot. The police have a reason to go into a house and somebody moves away from the house and they detain them. And that's upheld all the time. But the manner in which they're detained is critical. That officer wanted to gather intelligence and three of them did it at gunpoint while she's wearing handcuffs. That's not the way the Fourth Amendment is applied reasonably in this country. So I think the district court should be affirmed. Thank you. Thank you. Just very briefly, I want to point out, first, Judge Moore mentioned that in a Terry stop, of course, you can search for weapons. The Michigan v. Long case that we said in our brief and the progeny of that say that in the situation of a car, even if the person is not immediately armed, they can always reach over and grab one. So the officers are in a difficult situation not knowing whether there's a gun in quick reach hidden in the car somewhere. In fact, counsel just put it. Are you saying then that any time that a car, that there's reasonable suspicion to stop a car, that the driver can be frisked? I'm saying that in a situation where you're responding to a comment, I need a ride, I'm going to kill that bitch, it raises the stakes to a position where it's certainly reasonable for an officer to think there might be a weapon in the vehicle. When, as counsel points out, the officer is going into an ambiguous situation where I'm walking into an unknown, was the word that was used, that's when you really need to be careful that there might be a weapon secreted in the vehicle with an easy grasp. I want to point out, there was also another case that's cited in our brief, Causey v. City of Bay City, which is one certainly the officers should have been aware of, which speaks where exigent circumstances, the fear that there might have been some need to gather intelligence to get into a house because somebody inside might have been in danger, justified a forcible entry to a yard, a forcible entry to the house, and a detention of the persons inside the building while the officers made sure there was no one who was in danger. And this was certainly something that these officers would have been working off, guidance from this court, a published opinion. I'd also note that while the officers have training, as counsel pointed out, no one's contending the officers are omniscient. Again, they were walking into an unknown in a very quickly evolving situation that Kishina Brown herself concedes took only seconds. As soon as they had her up, all the rough stuff ended. They understood that she was a woman, she certainly wasn't the man that had been hurt. Then they just had to dispel their suspicions as to whether there was somebody in the house creating an exigent circumstance. Why didn't they take off the handcuffs at that point in time when they had her up and realized she was a woman? Oh, that's certainly an interesting question. But again, the detention wasn't more than the other ones in the other cases. It was only a few moments to make the phone call, and she had three other witnesses watching the scene that they took affidavits and testimony from and we said the whole thing lasted ten minutes at the most. Right, but your principle that you're suggesting that we should adopt is it's okay for the police to continue to keep somebody in handcuffs after they realize that the person is not the person that they were looking for. Well, they recognized it wasn't the male. They didn't know whether this person was a confederate of the male. They just didn't know who it was. They didn't know what was in the house. They didn't know who this was. She's obviously a woman. She's obviously not the man. But who is she? They don't know that yet either. This is all, again, the situations of ambiguities and unknowns, and only taking ten minutes to solve the mystery and dispel their suspicions is certainly a lot less time than this court has accepted in other cases. Again, I want to just note one last thing. It's kind of an oxymoron that struck me in the whole qualified immunity field. You know, there's the two-prong exam. Has there first been a violation of the Constitution? And then was it a violation of clearly established law? The first prong is, I think, something of an oxymoron because there's no constitutional violation. Obviously, you don't need immunity in the first place. But I think sometimes the way we look at those cases can detract us from the fact that immunity is there, that even assuming the officers did make a mistake in the heat of a fast-evolving situation, even when they do do it wrong, even when they do make a violation, they have immunity from that because we need our officers to be able to respond in a reasonable manner to situations that may, after the fact, turn out they had no need to respond at all, as it turned out in this case. But they have to be afforded what the Supreme Court has called that breathing room to be able to make mistakes in order that they can react appropriately when it's necessary. And even if this court is convinced that there has been a violation of the Fourth Amendment, what the officers did in this case was not unreasonable in the circumstances or under the case law that we've recited at length that they had before them at the time as to how they could react to this situation. I would note one last irony in this case, and that is if you read through the whole deposition of Ms. Brown, you see that she herself had been at various points a victim of domestic abuse. And it's that sort of thing that spurs officers the need to be able to respond to situations like this. If the panel has no further questions. Thank you very much. Thank you both for your argument. The case will be submitted. Would the clerk call the next case, please?